(Decided June 1st, 1860.)

# THE BANK OF COMMERCE *vs.* WM. F. DALRYMPLE, JAS. H. CARTER and GERARD GOVER.

In an action to recover damages for the refusal of the defendant to deliver to the plaintiffs an "extra dividend order," for the dividend on certain shares of stock of the Baltimore and Ohio Railroad Company which the plaintiffs had pledged to the defendant as security against the casual overdrawing of their accounts, the record of a suit by the city of Baltimore against the railroad company was offered in evidence by the defendant, for the purpose of showing that, in that case, an *injunction* had been granted, and is still in force, prohibiting the company from issuing the certificates of indebtedness, or extra dividend, provided for by the dividend resolution of the company. HELD:

1st. That this record was admissible for the purpose for which it was offered; as the injunction, in express terms, was designed to operate upon this extra dividend, the admissibility of the injunction cannot be denied upon the ground that it was *res inter alios.*

2nd. This *injunction* having been issued and served *before the extra dividend was payable,* and such extra dividend *orders,* separate from the stock, not being known as common articles of sale and purchase in the stock market until *after* that date, there was no obligation on the defendant to deliver such an order, and the refusal to do so gave the plaintiffs no right of action.

3rd. The injunction having been issued and served before the extra dividend could be demanded, under the terms of the dividend resolution, and not having yet been dissolved, the dividend was not such a *legal increment* to the stock, as gave the plaintiffs a cause of action therefor against the defendant as bailee of the stock.

Where a party sells goods on credit, without any promise on the part of the purchaser to give his note for the amount of the purchase, if the vendor subsequently demands such a note, he could not enforce such demand by any proceeding either in a court of law or equity.

APPEAL from the Superior Court of Baltimore City.

*Assumpsit*, brought on the 28th of April 1857, by the appellees against the appellant, to recover damages for the alleged refusal of the defendant to issue and deliver to the plaintiffs one of what were known as "Extra Dividend Orders," of the Baltimore and Ohio Railroad Company. The pleadings and facts of the case are fully stated in the opinion of this court. In the course of the trial, four exceptions were taken by the defendant to the rulings of the court below, (LEE, J.,) but, as this court has decided the case upon the ground, that the injunction prohibiting the railroad company from issuing the certificates of indebtedness for the extra dividend was sufficient to relieve the defendant from liability to answer, in damages, for refusing to give the order demanded by the plaintiffs, a statement of these several exceptions is unnessary, no decision being given upon any of them, except the second, which is fully set out in the opinion of this court. The verdict and judgment were in favor of the plaintiffs for $7500 damages and costs, and the defendant appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON and TUCK, J.

*John H. Thomas* and *S. Teackle Wallis,* for the appellants, argued:

That the court erred in refusing to permit the appellant to give in evidence the injunction record mentioned in the 2nd exception. It was offered merely to show the granting and pendency of the injunction set forth in it, and was the only competent evidence by which those facts could be established. 1 *Greenlf. on Ev.* secs. 527, 537. 14 *Md. Rep.*, 86, *Key vs. Dent, Admr. of Wood.* If, therefore, the granting and pen-

dency of the injunction, as shown by it, were facts relevant to the issue on trial, it should have been allowed to go to the jury to establish them. These facts were relevant, it is submitted, and for several conclusive reasons, viz:

Under the resolution of the rail road board, declaring the extra dividend, the certificates of indebtedness, in which the dividend was to be paid, were not issuable until the 12th of January 1857; until they should be issued, the holders of stock carrying the dividend might sell it with the dividend on, but were entitled to, and could have no specific evidences of, the dividend indebtedness. The injunction issued on the 10th of January 1857, prohibited the company and its officers from issuing the certificates, which could not, therefore, pending the injunction, be legally put forth. The sale of extra dividend orders, was a stock-jobbing device to circumvent the injunction—a sale of a mere possibility, and illegal, besides. The orders were not sold in the market till the 17th of January 1857, five days after the granting of the injunction; they were not accepted by the rail road company, or in any way accredited by their treasurer, and were mere orders on that officer to deliver a sum named out of a certificate of indebtedness, which the injunction had made it, for the time, unlawful on his part to issue. If the injunction should be dissolved they might be available, if it should be made perpetual they would be worthless. Their purchase or sale, therefore, was nothing but a stock-jobbing wager on the contingencies of a pending judicial controversy—a bet by the buyer that the injunction will be dissolved, and by the seller that it will be continued, and consequently, against public policy, and unlawful. 4 *Blackst. Com.*, 135. 16 *East.*, 158, *Gilbert vs. Sykes*. 1 *Leigh's N. P.*, 26 and note (m.) 5 *Mees. & Wels.*, 80, *Evans vs. Jones*. 2 *Parsons on Cont.*, 262, 264. 2 *Robinson's Practice*, 316, et seq. 4 *H. & McH.*, 284, *Wroth vs. Johnson*. *Act of* 1813 ch. 84. 8 *Gill*, 72, *Merrick vs. Bank of Metropolis*. 16 *How.*, 319, 334, *Marshall vs. Balto. & Ohio Railroad Co.* 9 *Md. Rep.*, 532, 533, *Gough vs. Pratt*. 12 *Louisiana Ann. Rep.*, 618, *Barham vs. Livingston*. Nothing but proof

of the injunction could establish this illegality, and such proof was, therefore, necessarily relevant and most material.

In another point of view proof of the issuing and pendency of the injunction was equally relevant and important. Mr. Harris, one of the appellees' witnesses, in testifying as to a fall in the price of the stock of the Baltimore and Ohio Railroad company, sold with the extra dividend on, referred to the issuing of the injunction, in question, as the cause of the fall. Whether that statement by the witness, uncalled for by the appellees' counsel, afforded a ground for the appellant to insist, that the injunction had been brought by the appellees before the court, and the record thereby made *ipso facto* admissible, may be disputed. But it seems clear, that on Mr. Harris' showing the injunction affected the value of the dividend orders, that fact, of itself, rendered proof of the injunction admissible on the question of value, which furnished the criterion of damages. Whether, therefore, the fact came out on the examination of Mr. Harris, by the appellees, or as a matter of voluntary statement by the witness, it was a relevant fact, and the record showing what the injunction was, became relevant along with it. The appellant could have elicited the fact from the witness and have followed it up, or explained it by proof of the injunction record, as they did under their 3rd exception.

But even without reference to the testimony of Mr. Harris, and under the 2nd exception only, the relevancy and importance of the proof in controversy, on the question of damages, would seem indisputable. If the injunction be made perpetual, the dividend orders will turn out to have been worthless in fact and in law. If it be dissolved, it is apparent that they must be worth more than there is any proof of their ever having been sold for, which case, in the refusal of Mr. Alnutt to deliver the order required, will have been a benefit to the appellees instead of an injury. Until the final decision, therefore, upon the injunction, it is impossible to tell whether the appellees have any cause of complaint, and the proof of the issuing and pendency of the injunction, is therefore, vital, not only as to the *quantum* of damage, but

as to the very fact of damage at all. It would show that this action is premature, at all events, even if possibly maintainable hereafter. The question here is, not whether the orders might not have been sold if given, but whether the appellant or Alnutt committed a wrong, for which it or he is responsible in damages for refusing to give them. The appellees in their prayers asssert, that the standard of damages is the market value of the orders, at the time of the refusal to deliver on demand made. But there was no market value of the orders until after the injunction was obtained; the injunction was, therefore, admissible, because it was issued before the criterion of damages, set up in the appellees' prayers had any existence at all, and must have materially affected the question of damages. Again, if the rail road company had no power to issue these orders, if they were in fact fraudulent, illegal and of no value, and could not be enforced, could the appellees recover for a refusal to give them such orders? The bill on which this injunction was issued, charges the dividend to be fraudulent and illegal, and that it was declared in violation of the charter of the company, and the appellee had a right to have this *fact* before the jury. The injunction forbid the issuing of the certificates of indebtedness mentioned in the dividend resolution. The stock-jobbers then get up a commodity called "Dividend Orders," and sell them in the market. What was this but a device to evade the injunction, to make that a saleable article which the injunction forbid to be issued? Suppose the appellees had applied to a court of equity to compel the bank to give them these orders, would not the court have told them to wait till the question of the legality of the orders was first decided? Suppose an order of this kind had been stolen, could an indictment have been preferred for stealing it till this question was first decided? Suppose any one, having an interest in the result of a suit, should apply to a party pending such suit, to give some muniment of title or order by which he was to realise the proceeds of suit when terminated, and the party should refuse, could it be contended that an action for damages would lie for such refusal?

Whether Alnutt or the bank be charged with the duties and subject to the liabilities of pledgee, is immaterial, for we insist that there is no obligation on either of them, to execute and deliver the dividend order in question. It is admitted, that the stock pledged was duly retransferred on the 1st of January 1857, when demanded: it is also admitted, that a cash dividend declared thereupon while the stock stood in Alnutt's name, was duly collected by him, and passed at once to the credit of the appellees. If the certificates of indebtedness, which were intended to represent the extra dividend had been issuable, while the stock stood as Alnutt's, it would have been his duty to receive them, and to pass them over when the purposes of the pledge were at an end. But until they were issuable, the bailee had no duty to discharge in regard to them. He had no obligation to do more than he offered to do, that is, collect them and hand them over when the time should arrive for doing so. He was not bound to give a written evidence of such obligation in advance, in order to enable the pledgors to dispose of that written evidence in the market. If a vendor sells a horse on credit, without any promise on the part of the vendee to give his note, a subsequent demand by the vendor for such a note, so that it might be sold in the market, could not be enforced either at law or in equity, and there is no obligation on the vendee to give it. Much less was Alnutt bound to give a written paper, not known to the law nor to usage, devised for the temporary purposes of the stock board. The fact that such writing could have been sold in the market imposed no liability on him for refusing to give it, because his responsibility depended on his own obligations, and not upon the profit which the appellees could have made by selling a written acknowledgment of them. If the dividend declared had been a cash dividend, payable on the 12th of January 1857, Alnutt would not have been required to give an order in advance for it, on retransferring the stock on the 1st of January. He would have been strictly within the line of his duty, if, as soon as it was payable he gave the order for it, or collected it and paid it over. Why should a stock dividend create any difference in principle?

Nor was the giving of the order demanded at all necessary, in point of fact, to give the appellees the benefit of the extra dividend, as a saleable article, in advance of its maturity. It was proven by Mr. Harris, a witness for the appellees, that in all sales of the orders in question, whether separately or in conjunction with stock, the orders were accepted on the faith of the vendors, referred to no particular stock, required no acceptance or acknowledgment on the part of the treasurer of the rail road company. This proof is uncontradicted. It was, therefore, perfectly competent for the appellees, as the owners of the stock, and entitled to the dividend, to issue their own orders for the dividend upon it, and sell them without any embarrassment or impediment. They could have done so as well, to all intents and purposes, as Alnutt or the bank.

*Wm. A. Fisher* and *Wm. H. Norris* for the appellees.

The record in the case of the *City of Baltimore vs. the Railroad company,* offered in evidence as stated in the second bill of exceptions, was properly rejected, because it was not only *res inter alios acta* but irrelevant.

The five hundred shares of the stock of the railroad company was *pledged* by the appellees to the bank as security for any casual overdrawing of their account with the bank, and this pledge was *accepted* by the bank. It was made in August 1856, and the stock was transferred on the books of the railroad company to the name of Alnutt, the president of the bank, and the certificates of the stock were made out in his name and delivered to him, and by him accepted and deposited among the securities of the bank. The legal title to this stock was thus in the bank, or in Alnutt, its president, and so remained from the time of the pledge till the 31st of December 1856, when the purposes of the pledge were accomplished and the bailment was at an end. During all this time the relation of bailor and bailee existed between the appellees and the bank, and the law of bailments is very clear, that the pawnor is entitled to a return of the article pledged *with all its increments. Story on Bailments, secs.* 339, 343.

2 *Kent.*, 578, 579.   *Edwards on Bailment*, 268.   *Story on Sales*, secs. 184, 185.   Now, on the 17th of December 1856, whilst this stock was so pledged to the bank, the railroad company declared an extra dividend of thirty per cent. on its capital stock, payable on or after the 12th of January 1857, to all stockholders owning stock on the 22nd of December 1856, in certificates of indebtedness, bearing interest, and convertible into stock on the 1st of June 1862.   The bank being the owner, or having the legal title to this stock on the 22nd of December 1856, was the party to whom, according to the terms of the dividend resolution, these certificates were to be issued.   On the 1st of January 1857, the appellees, having settled their account with the bank, and terminated the bailment, demanded a return of this stock with an order upon the treasurer of the railroad company for the certificates of indebtedness issuable under the dividend resolution.   The stock was returned, but the bank then, and from time to time afterwards, until the 26th of February 1857, refused to give the order for this dividend, and the question is, have the appellees any right of action against the bank for this refusal?

The proof shows that sales of stock, made after the dividend was declared, and before it was payable, carried the dividend or not, as the parties might agree, and that sales of the stock, carrying the dividend, were made between the 1st and 17th of January, at prices ranging from 84 to $88\frac{1}{2}$, whilst without the dividend it was sold at 71, and that on the 17th of January 1857, the orders for the dividend, separate from the stock, were sold, and from that time forward became common articles of sale in the market.   The prices during January being 50 and upwards, but falling in February to 30, and at the time of the trial of this case, to from 9 to 11 per cent.   Now, it is said, on the part of the appellant, that we have no cause of action against the bank, because an injunction was issued on the 10th of January 1857, at the suit of the city of Baltimore against the railroad company, prohibiting the issuing of the certificates of indebtedness provided for in the dividend resolution.   To this we answer:

1st. That our right of action accrued on the 1st of January 1857, when our demand was made and when the dividend was actually declared, and *prior* to the issuing of the injunction. The breach of the contract of bailment was *before* the injunction, for the authorities already cited, show, that it is the duty of the bailee to restore the pledge with all its increments, and that the return must be made at the *time of demand*, and in the only *reasonable mode in which the particular articles can be delivered*. And the proof shows that the usual and customary mode of making delivery of these orders, was in the form in which they appear in the record, and the refusal by the bank to deliver was not based upon objection to any particular form of the order.

2nd. That the injunction did not prevent the *sale* of these orders; they were proper subjects of sale, notwithstanding the injunction, and could have been, and others of the same character were, sold *subject to it*. "It is sufficient that the thing contracted for has a potential existence; and a single hope or expectation of means founded on a right *in esse* may be the object of sale, as the next cast of a fisherman's net, or fruits, or animals not yet in existence, or the good will of a trade. But a mere possibility or contingency, *not coupled with any interest in, or growing out of property*, as a grant of the wool of the sheep the grantor may thereafter buy, or the expectancy of an heir-apparent is void as a sale." 2 *Kent.*, 468, and *note e*. *Story on Sales, secs.* 184, 185, 186. 4 *H. & J.*, 358, *Ridgely vs. Riggs*. We could have sold a dividend on this stock *not yet declared*, for it would have had a *potential existence* within the meaning of these authorities, much more could we have sold a dividend actually declared, the payment of which only was restrained by an injunction. Suppose a party is, or claims to be, entitled to a fund in court, the payment of which is enjoined, can he not sell his interest in that fund, subject to the injunction? Such a sale, it is submitted, would neither be against the policy of the law, nor a *wager* contract. In the case of a wager contract the interest is *created* by, and *springs out* of, the *wager*, whereas, here the interest was created before the

Bank of Commerce *vs.* Dalrymple, *et al.*

injunction by the *possession* of the stock upon which the dividend enjoined was declared.

3rd. Nor is this injunction record admissible on the question of damages, for the purpose of showing a decline in the market value of these orders. The suit is for indemnification for refusal to deliver the orders, and in such a case the standard of damages is the *market value* of the orders. What that value was could be proved only by evidence of what they sold for in the market. What *caused* their decline is immaterial to the only question before the jury, which was, their market value?

4th. Nor is there any force in the objection, that we could have issued the orders, and therefore, that no damage was done us by the refusel of the bank to do so. We could not have issued the orders, for the stock did not stand in our names on the 22nd of December 1856, when, by the terms of the dividend resolution, it must have so stood in order to entitle us to the dividend, or to issue orders for it. At that time it stood in the name of Alnutt, as president of the bank, and the orders must come from him or the bank. 2 *Eng. Railway & Canal Cases*, 37, *Hebblewhite vs. M'Morine*.

*Note.*—The argument, on both sides, upon other points in the case, is omitted.

ECCLESTON, J., delivered the opinion of this court.

This action of *assumpsit* was instituted by the appellees against the appellant, to recover damages for the alleged refusal of the latter to issue and deliver to the former, one of those orders which were known as "Extra Dividend Orders" of the Baltimore and Ohio Railroad Company.

The *nar.* contains six common money counts. The plea is, that the defendant did not promise as alleged.

Then follow three agreements:

*First.* "That the within plea shall be considered as filed subsequent to the *nar.* and notice, and all errors of pleading on both sides waived."

*Second.* "That the plaintiffs in this case may, under the

declaration in this case, recover any amount they could under any *nar.*, in *assumpsit,* and that the defendant may give in evidence any defence they could have taken by special plea."

*Third.* "That this case is to be tried as if issue had been formally joined on the record."

The plaintiffs, as partners, were engaged in business as stock and money brokers, under the firm name of Josiah Lee & Co., and during the year 1856, kept their account with the defendant, the Bank of Commerce, of which James W. Alnutt, was then, and has ever since continued to be, president. For the purpose of securing the defendant against any loss, from the casual overdrawing of their account at any time, the plaintiffs, on the 25th of August 1856, voluntarily transferred upon the books of the Baltimore and Ohio Railroad Company, to the name of "James W. Alnutt, president," five hundred shares of the capital stock of the said company, and delivered the certificates thereof, so made out, to Alnutt, which he accepted, and deposited among the securities of the bank. On the 17th of December 1856, the president and directors of said railroad passed the following resolutions:

"Whereas, there has been appropriated by the Baltimore and Ohio Railroad Company, from time to time, the sum of three millions of dollars and upwards, of the net earnings of the main stem of the road, to the purpose of construction, with the intention, in conformity with the practice of the company, of paying the same to the stockholders in the shape of a dividend, at such time as they might deem judicious, therefore, be it

"Resolved, That an extra dividend of thirty per cent. be declared on the stock of the company, to be paid on or after the 12th day of January next, to all stockholders owning stock on the 22nd day of December 1856, in certificates of indebtedness, bearing an interest from the first day of June 1857, of six per cent. per annum, payable half-yearly on the first day of December and June in each year, until the first day of June 1862, inclusive, after which, the said certificates

of indebtedness shall be converted into the stock of the company at par.

"Resolved, That for the payment of the dividend aforesaid, the transfer books be closed on the 22nd instant, and remain closed until the 12th day of January next."

On the 31st of December 1856, the appellees dissolved their copartnership, and settled their account with the bank, leaving nothing due the bank.

On the 1st of January 1857, they demanded of Alnutt to deliver up to them the said shares of stock, and to give them, likewise, an order on the treasurer of said railroad company for the certificates of indebtedness corresponding thereto, under the aforesaid resolutions of the 17th of December 1856. Alnutt redelivered the certificates of stock which had been pledged, duly endorsed and re-assigned, but refused to give any written order, as demanded, for the extra dividend, saying that he would collect it, if it was ever paid, and hand it over to the plaintiffs. In October 1856, a cash dividend had been declared upon this stock, while it stood in Alnutt's name, which he collected and immediately passed to the credit of the appellees with the bank.

Proof was given that on more than one occasion, the plaintiffs renewed their demand upon Alnutt for a written order, as aforesaid, for the said extra dividend, which he continued to refuse; whereupon, on the 24th of February 1857, by a letter addressed to the president and directors of the bank, the plaintiffs gave notice that the said president and directors would be held responsible for damages resulting from their refusal to transfer, by order or otherwise, the said extra dividend.

When this letter was presented to Alnutt, he said he would attend to it, but did not want the orders of the bank hawked about the streets. On the 26th of February 1857, James W. Alnutt, president, enclosed to the appellees an order for the extra dividend, stating that the Bank of Commerce had no interest in it or the stock, the same being the property of the appellees. This order was returned the same day, the appellees refusing to receive it, unless they were paid the dif-

ference between the then market price of it, and that for which such orders were selling on the 1st of January previous.

The order sent by the defendant to the appellees was as follows:

"BANK OF COMMERCE,
Baltimore, *February 26th,* 1857.

Joshua J. Atkinson, Esq'r, Treasurer of the Baltimore and Ohio Railroad Company:

Please deliver to Messrs. Josiah Lee & Co., the certificate of indebtedness for the amount of dividend on the five hundred shares of the capital stock of the Baltimore and Ohio Railroad Company, standing in the name of James W. Alnutt, president, on the twenty-second day of December last, as represented by certificates Nos. 20582, 20583, 20584, 20588. All of which bear date the twenty-fifth day of August last, and were on the first day of January, eighteen hundred and fifty seven, assigned and transferred to the said Josiah Lee & Co., by endorsement; said stock being their property. Bank of Commerce having no interest whatever in the said stock or certificate of indebtedness is hereby made in no way responsible or liable for the certificate of indebtedness embraced in this order. JAMES W. ALNUTT, Presid't."

The following letter is that which was sent by the appellees when the above order was returned to the defendant:

"*James W. Alnutt,* Esq'r, President.

*Bank of Commerce.*

Sir,—Yours of 26th inst. is received with an order for the dividend of the 22nd December last on 500 shares Baltimore and Ohio Railroad stock which we herewith return, but will receive again, on condition, that you pay us the difference between the market price of said dividend at the time you refused to deliver it and the present market price. In the event of your refusal to do this we hereby repeat we shall hold you responsible for any loss sustained in consequence of your action in the case.

Respectfully yours, &c.,
JOSIAH LEE & Co.,
Baltimore, February 26th, '57."

The proof shows that in January 1857, orders on the treasurer of the Baltimore and Ohio Railroad Company, for certificates of indebtedness on the extra dividend, under its resolutions, became common articles of sale and purchase in the Baltimore stock market, separate from the stock on which the certificates were to be issued, the first sale being made on the 17th of that month, at 50 per cent. of their par value.

In making sales of such orders at the stock market, whether separately, or in conjunction with the stock itself, it was not necessary that such orders should have been previously presented to or noted by the treasurer of the company—said orders did not refer to any particular named stock, and were taken on the good faith of the party giving them. This was the case even when the orders were in fact delivered; but when time contracts were made, there was no delivery of any orders at the time of the contracts, nor any required or made until the maturity of the contracts.

The treasurer of the railroad company never accepted said orders when presented to him, as many of them were, and made no note or memorandum of any kind, and entered into no engagement of any kind binding the company to the holders, and would not have done so in any case.

According to the testimony of Thomas Coulson, such orders were sold at the following rates on the dollar:

| Jan'y 17, | 1857, | at | 50 cents. |
| " 20, | " | " | $50\frac{1}{4}$ " |
| " 22 & 24, | " | " | 55 " |
| " 26 | " | " | 54 " |
| " 27 | " | " | $51\frac{1}{2}$ " |
| Feb'y 24 | " | " | $30\frac{1}{2}$ " |
| " 25 | " | " | 30 " |
| " 26 | " | " | $30\frac{1}{2}$ " |
| " 27 | " | " | $30\frac{1}{2}$ " |
| " 28 | " | " | 30· " |

At the time of the trial of this case the orders were worth from 9 to 11 per cent.

Fifty shares of the stock in question, which had been re-transferred by Alnutt to the plaintiffs, were sold and delivered by

them to Fisher on the 9th of March 1857, at $82 per share, carrying the extra dividend, and orders for the extra dividend were supplied from another source.

All sales of this railroad stock, prior to the declaration of the extra dividend in question, made at the Board, carried the extra dividend, but if made after, they carried it or not, as the parties might agree in the particular case.

Although the first sales of the orders, separate from the stock, were made on the 17th of January 1857, there were, nevertheless, sundry sales of stock carrying the extra dividend, made from the 1st to the 17th of the same month, at prices ranging from 84 to 88½ cents on the dollar, and on the 13th of that month stock was sold without the extra dividend at 71 cents.

The plaintiffs offered to prove, that sundry time contracts, by them previously made, for the delivery of Baltimore and Ohio Rail Road stock, with the extra dividend on, matured between the 22nd of December 1856 and the 13th of January following, while the transfer books were closed, to the amount of 1000 shares in all, and that if they had been in possession of the dividend orders, here in controversy, they might have used them in fulfilling said contracts in part on January 13th, 1857, when the transfer books were re-opened, and delivery under said contracts was to be made. The evidence was offered for the purpose of proving damages sustained by the plaintiffs in consequence of the non-delivery to them of the dividend orders demanded as herein before stated.

To the admissibility of which evidence the defendant objected, but the court overruled the objection, and permitted it to go to the jury for the purpose for which it was offered; which ruling constitutes the ground of the defendant's first exception.

It appears from the testimony of the witness, Coulson, that the letter of the 24th of February 1857, was delivered by him on that day, to James W. Alnutt, President of the Bank of Commerce, at the Banking House; and that during the interview between them, Alnutt said nothing about the

kind of dividend order he might sign, nor did he raise any objection on account of any particular form of order. Whereupon the defendant admitted that no particular form of order was demanded by the plaintiffs, and that said Alnutt's refusal to accede to the several demands of the plaintiffs, was not placed upon the ground of his objection to any particular form.

The defendant offered in evidence a duly authenticated and sufficient transcript of the record in the case of the Mayor and City Council of Baltimore against the Baltimore and Ohio Rail Road company, in the Circuit court for Baltimore city, not as evidence of any of the matters and things therein alleged and averred, but merely to show that the said court, in the said cause, did, on the 10th of January 1857, issue an injunction, prohibiting the Baltimore and Ohio Rail Road company, its officers and servants, from issuing, or causing to be issued, the certificates of indebtedness or extra dividend, provided for by the resolution of the president and directors of said company, given in evidence by the plaintiffs, and that injunction had never since been dissolved. The plaintiffs' counsel objected to this evidence, which objection being sustained by the court, the defendant excepted.

This decision, we think, is erroneous. The injunction should have been admitted as proper evidence for the purpose for which it was offered.

The resolutions of the company, under which the extra dividend is claimed, provided that the same was to be paid "on or after the 12th day of January, then next," * * * * "in certificates of indebtedness, bearing an interest," &c.

On the 10th of January 1857, two days before the certificates could be demanded of the company, under their resolutions, the injunction referred to was issued and served; and had not been dissolved, when this case was tried.

Under such circumstances, it has been contended by the appellant's counsel, that there never was any obligation upon Alnutt, or upon the bank, to deliver to the appellees the orders demanded by them, and, therefore, the refusal to deliver the same gave the appellees no right of action.

It would seem to be a clear proposition, that prior to the 12th of January 1857, no stockholder could have demanded of the rail road company a "certificate of indebtedness" on account of the extra dividend, or any evidence of, or security for, the said dividend.

Prior to that date, what have subsequently been called "extra dividend orders" of the Baltimore and Ohio Rail Road Company, and now in question, were not known as having any separate existence, or as being understood to be legal entities. They were not known as common articles of sale and purchase in the Baltimore stock market. The first sale of them, as separate from the "certificates of indebtedness" for the extra dividend, provided for in the resolutions of the rail road company, is proved to have been made on the 17th of January 1857. Thus it appears the injunction was issued and served before any stockholder had a right to demand of the company the "certificates of indebtedness," before the "extra dividend orders" had become common articles of sale and purchase in the stock market, before the first separate sale of such orders, and indeed, before they became known or were considered as legal entities, either at the stock board or elsewhere; at least, there is no proof to the contrary.

The injunction was the act of a court of competent jurisdiction on the subject, and it directly prohibited the company from issuing the certificates of indebtedness for the extra dividend, and, as a consequence of it, no legal demand for them could be made. It, in effect, was sufficient to relieve the defendant from liability to answer in damages for refusing to give the orders demanded by the plaintiffs.

There has been no contract between the present parties for the sale and purchase of these orders, stipulating for their delivery at any time. The claim urged by the appellees is based upon a voluntary deposit of the stock with the defendant, or with "James W. Alnutt, President," which stock has been returned. They insist, that the deposit was in the nature of a bailment, and that when the principal or corpus was returned they were also entitled to the extra dividend as an increment, and therefore, they had a legal demand for

the dividend orders. But before the extra dividend could be demanded, under the terms of the resolutions declaring the same, the injunction was issued and served, and has not yet been dissolved. It is believed, therefore, that there was no such legal increment in existence as to give the appellees a cause of action against the defendant.

There can be no doubt that if A sell goods to B, on credit, without any promise on his part to give a note for the amount of the purchase, if A should, subsequently, demand a note, he could not enforce such demand by any proceeding either in a court of law, or of equity. There would seem to have been no more obligation on the defendant in this case, to have given the order demanded by the plaintiffs.

In the order sent by the defendant to the plaintiffs, on the 26th of February 1857, the treasurer of the rail road company was authorised to deliver to the plaintiffs the certificate of indebtedness for the extra dividend, in question, in which order the defendant disclaimed any interest, whatever, in the stock or certificate of indebtedness, therein mentioned.

Inasmuch as the injunction, in express terms, was designed to operate directly upon this extra dividend, the admissibility of the injunction in evidence, cannot be denied upon the ground of its being *res inter alios acta.*

For the purpose of showing the propriety of admitting it as evidence, we would refer to *Key vs. Dent, Adm'r of Wood,* 14 *Md. Rep.*, 97, 98, and the authorities there cited.

If the views which have been presented in this opinion are correct—and we think they are—the judgment should be reversed, without a *procedendo;* and therefore, the other questions which have been urged in argument do not require consideration.

This decision is to be understood as made with reference to the circumstances existing at the institution of the suit, and not as intimating any opinion in regard to the rights of the plaintiffs below, in case the injunction should be dissolved.

*Judgment reversed without a procedendo.*

(Decided June 1st, 1860.)